## UNITED STATES v. COLLIER.
### No. 9049.

Circuit Court of Appeals, Fifth Circuit.
June 12, 1939.

Asst. Atty. Gen., H. S. Phillips, U. S. Atty., of Tampa, Fla., and H. G. Taylor, Asst. U. S. Atty., of Miami, Fla., for the United States.

Peter O. Knight, C. Fred Thompson, P. O. Knight, Jr., and Jno. Bell, all of Tampa, Fla., W. B. Spencer, of New Orleans, La., and Samuel H. Kaufman, of New York City, for appellee.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Barron G. Collier on May 31, 1933, filed a petition for extension of his debts under Sect. 74 of the Bankruptcy Act, 11 U.S.C.A. § 202. The United States filed claims for additional income taxes assessed for the years 1930, 1931 and 1932, and later for additional assessments for the years 1933, 1934 and 1935. Objections to these claims were made, especially because the Commissioner had refused each year to allow as deductions interest paid out by Collier on his indebtedness, and in the years 1934 and 1935 had disallowed certain bad debts charged off. By a judgment rendered Oct. 3, 1938, the court upheld the objections in part and overruled them in part, and the United States have appealed from so much of the judgment as is adverse to them.

The evidence is not contradictory, but is in many particulars unsatisfactory in that the persons who actually conducted most of the transactions under investigation have not testified to them and the truth of them is left to Collier's books, and the interpretations made of the entries. It appears that Collier was originally in the advertising business, but by 1930 he conducted through many corporations which he had organized or purchased a network of businesses covering the entire United States, and including, besides advertising, banks, hotels, amusements, and transportation. There was a holding company owned and managed by him called Collier Brothers which owned the stocks of more than a hundred other corporations whose affairs were conducted by their several officers. Still other corporations were owned in whole or in part by Collier. These businesses were generally prosperous until the beginning of the depression, when some had to be aided. This aid was furnished sometimes by funds which Collier borrowed on his notes from outside banks, sometimes by his borrowing from his own stronger corporations on open account, and some-

Clarence E. Dawson and Sewall Key, Sp. Assts. to Atty. Gen., Jas. W. Morris,

times by his accepting drafts of his corporation to be discounted by the corporation with the bank with which it did business. In this way Collier became heavily involved both to banks and to some of his corporations, and when a few of them failed he entered bankruptcy seeking an extension. The borrowings became very heavy. It appears that in 1930 more than $700,000 for interest was paid out by the corporations, and $550,615 for interest is claimed to have been paid out by Collier, though his gross income from salaries, dividends, and other sources was only $530,855. The Commissioner disallowed on his return for 1930 $266,874. Smaller claims and disallowances appear for the later years. The District Judge held all these claims of interest paid to be proper deductions. Collier's returns are made on a cash receipts basis.

We think the deductions fall into two classes: First those relating to notes which Collier gave directly to the banks, and second those relating to certain drafts accepted by Collier drawn by one of his corporations and discounted by it at the banks. These notes (except one) were payable to a bank and signed by Collier alone as his individual obligation, some bearing interest from date and some from maturity, the latter being discounted. The proceeds sometimes were directed by him to be placed to the credit of one of his corporations and a charge of the amount to it was made on his personal books; sometimes they were used to retire like notes. Sometimes the exact use is not clear; but in all cases in dispute the loan was connected with some corporation. The Commissioner's theory was that they were really corporate loans in the name of Collier who was a mere agent in making them, so that he did not owe the interest. It is also contended that it is not proven that he in fact paid the interest, which in a few cases seems to have been paid in the first instance by the corporation concerned, and credit afterwards given to the corporation on Collier's books for the payment. Collier, it appears, never charged his corporations any interest when he advanced them money on open account, nor paid any when he borrowed from them. It is also argued that discount is not interest within the meaning of the statute.

All of the Revenue Acts involved allow to be deducted "All interest paid or accrued within the taxable year on indebtedness", with exceptions not here material. Rev.Acts 1928, 1932 and 1934, Sec. 23(b),

26 U.S.C.A. § 23(b). Where the taxpayer is on a cash receipts basis, as Collier is, the interest must be actually paid in the tax year and not merely accrued. United States v. Mitchell, 271 U.S. 9, 46 S.Ct. 418, 70 L.Ed. 799. Where the transaction is a short term loan, and not the sale of a security on the market, the discount deducted is interest. Whether the borrower on a cash basis may deduct it as interest paid on the date of the borrowing, and whether the lender should return it as interest then received, or only when the note is paid at maturity, is not a question made here. The interest paid otherwise than by way of discount was in most cases by Collier's check against his own funds. In the case or cases where it was first charged by the bank against one of Collier's corporations, and then the corporation was credited on Collier's books with the payment, we think the interest was paid when the corporation paid it in behalf of Collier, and when he ratified the act and made recompense satisfactory to the corporation by entering the credit he can claim it as his payment. Compare E. Gordon Perry v. Com'r, 28 B.T.A. 497; Geo. D. Mann v. Com'r, 33 B.T.A. 281.

So far we have assumed that the interest was Collier's and to be allowed to him as a deduction. That is our opinion. Where he signed notes promising interest, or himself discounted them, he might possibly have acted as an agent in making the notes, but no one so testifies. The form of the notes and the entries on his books show an individual loan to him from the bank. The bank could look only to him as maker of the note. The money borrowed was his, to do what he pleased with. If he wished to advance it without interest to one of his corporations, thinking it would ultimately benefit him as owner, he could do so. He is entitled to a deduction of the interest actually paid by him in the tax year, no matter what he did with the borrowed money, it not being within the exceptions made by the statute. The judge was well sustained in allowing the interest paid on such notes in all years.

One of the note transactions differs from the others. On Oct. 30, 1929, Collier gave his note for $350,000 due in four months payable, not to a bank, but to Collier Service Corporation. It was indorsed by the payee and discounted at payee's bank, Chase National. A witness first testified that the proceeds went to the credit of payee as a payment on what Collier owed

payee, but later said the proceeds were by the payee placed to the credit of another corporation of similar name as a payment on what Collier owed the latter, and Collier's books agree with the last statement. It clearly appears from correspondence that Collier himself handled with the Bank the renewals of this note. It is not very plain who really paid the discounts, but temporarily they seem to have been charged against the payee's account in the bank. But payee was at the time indebted to Collier for advances, and on his account for these he credited payee for what payee had been charged for the discounts. Payee seems to have made corresponding entries on its books, thus agreeing to this disposition, and the account was later settled in full. Though no money passed, all parties being solvent, it was as though payee had paid cash to the bank for Collier and he had repaid it to payee, and payee had repaid the same amount to Collier on its debt to him, and all might treat what was done as cash transactions in making income tax returns. We think the judge could conclude that the transaction of loan with the bank was really Collier's throughout, done through the Collier Service Corporation in order to obtain its indorsement and credit with its bank, and that he was to bear the discount, and did pay it when he entered credit for it on the account he had against the corporation. We will not overrule this fact conclusion.

■ We think the five drafts in controversy stand otherwise. All were drawn on Collier by one of his largest corporations which operated in New York City and had strong banking connections there, and to it he was himself in debt. It appears that at different dates the corporation drew the drafts payable in six months in favor of five several banks; Collier accepted them; and then they were taken to the several banks by the corporation and dis-- counted, the proceeds less discount going to the credit of the corporation's account at each bank. When the drafts fell due they were charged back to the corporation's account, and new six months drafts for the same or a less amount similarly discounted. Finally in September, 1932, the outstanding drafts were taken up in a refunding operation by the corporation. Since that date Collier is claiming no deduction for interest paid by himself. Prior to that date at the time of or subsequent to each discount Collier, having charged the corporation with the face amount of the draft, credited

it on his books with the amount of the discount as "interest". The corporation, since the books of both were testified to be in agreement, probably made similar entries. In our opinion, these facts do not show that Collier paid any deductible interest. On the face of the transactions he personally did not borrow any money on the drafts. The transaction had with the lending bank was that of the corporation. It agreed upon the discount to be deducted and received credit on its account with the bank for the net proceeds. Collier in accepting the time draft promised only to pay its face at maturity. He had no concern with interest or discount, and what he owed was unaffected by the transfer of the draft to the bank. At maturity the draft was charged back to the corporation, which was secondarily liable by indorsement, and it again arranged the discount of a draft to cover. Collier did not owe any interest on the drafts or pay any. It is true that the transactions were for his benefit in that each time he was heavily indebted to the corporation. But it received the drafts from Collier as credits on his indebtedness, and retained and used the cash proceeds, except in one case at the beginning the draft overpaid Collier's indebtedness and he withdrew the excess. The book entries crediting the corporation with the interest (by way of discount) which it had paid were just, because Collier had not paid the amount of the draft in cash, but in a time draft not worth its face. It may even be (though it is not directly proven) that he agreed with the corporation to bear its loss in discounting. He would then be bound to reimburse the corporation, but it would be only a debt due to the corporation, and not interest which he owed and had paid the bank. Yet further, if we should hold it to be interest within the meaning of the statute, Collier never paid it so as to claim a deduction, he being on a cash basis. Each time when he credited the interest (discount) to the corporation he was indebted to it, and the credit was only an acknowledgment that he owed that much additional, not a payment. Never through the tax years did he pay up his account. The one time when his draft overpaid his indebtedness and he got the excess was in June, 1929, before the first tax year, and at that time he charged the corporation only with the net proceeds of that draft—there was no interest entry. If the credits for interest which he gave the corporation be interpreted to evidence a

promise to reimburse the corporation they fall short of showing any cash disbursement. To give a note to a creditor for interest due him is not a payment of it which warrants a deduction on a cash basis. Hart v. Commissioner, 1 Cir., 54 F.2d 848. One must part with money, or property of value. Eckert v. Burnet, Commissioner, 283 U.S. 140, 51 S.Ct. 373, 75 L.Ed. 911. An admission of additional indebtedness on an account is no more than giving a promissory note. The case is not like an actually accomplished set-off which we have held to be capable of being treated as a cash transaction. Bailey v. Commissioner, 5 Cir., 103 F.2d 448. Here there was nothing to be set-off. Both because Collier owed no interest, but at most an obligation to reimburse, and because if he did owe he did not pay it during the tax year, the deductions are not allowable.

■ Collier made advances to three of his companies which failed, two going into bankruptcy, and his claims against them were charged off his books as debts ascertained to be worthless. Deductions were sustained by the judge. We find no cause for reversal. The advances were not gifts, nor made without hope of repayment. The evidence well justifies the inference that they were made by the owner of the corporations in the hope of tiding them over their difficulties and saving them. Without doubt each claim became worthless. The only substantial question is as to when the worthlessness was ascertained so as to justify the charge off. Two of the corporations went into general bankruptcy. A voluntary bankruptcy may occur without insolvency (in the bankruptcy sense) but it is unusual. Treasury Regulation No. 77, Art. 191, under the Revenue Act of 1932 declares: "Bankruptcy is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt." If there appears no reasonable hope of a dividend we think a charge off may be made without waiting for a closing of the estate. This was done as to one of these corporations and no dividend was in fact ever paid. The charge off is sustainable.

■ In the bankruptcy of the other corporation there was hope of a better result and the court operated the business for another year, but at a loss. A composition of 15% was arranged by Collier, who was surety on much of the indebtedness, waiving the dividend as to his claim for advances; and another of his corporations bought the assets at bankruptcy sale approved by the court. Thereafter Collier charged off as worthless his claim. The sale of assets was regular and the adequacy of the price is not contested. The proceeds went to administration expenses and to pay the 15% to other creditors. The bankrupt had nothing left. Collier's claim was then worthless. If he had not waived his dividend one of about 10% to all, instead of 15% to all but him, could have been paid, but because of his secondary liability he would have been little if any better off. The point is not here made that the claim was really 10% good before the waiver and only 90% ought to have been charged off: It was wholly bad when the charge off was made. On the question as presented we affirm.

■ The third charge off concerned a corporation which did not go into bankruptcy but ceased to function. Bankruptcy or an unavailing suit is not necessary to ascertain that a claim is worthless. Collier's financial agent enquired of Collier's attorney as to the collectibility of the claim and was advised to charge it off. The attorney does not remember what investigation he made, but he knew it was uncollectible. No one disputes that it was worthless. We see no reason to disturb the conclusion that its worthlessness was ascertained in the year of the charge off.

We reverse the judgment with direction to make one in conformity with the opinions here expressed.