**Frank NELSON, Jr. and Lee Etta Nelson, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

No. 17872.

United States Court of Appeals
Fifth Circuit.

July 14, 1960.

Rehearing Denied Sept. 7, 1960.

**2**

Lee C. Bradley, Jr., John N. Wrinkle, Birmingham, Ala. (White, Bradley, Arant, All & Rose, Birmingham, Ala., of counsel), for petitioners.

Joseph Kovner, A. F. Prescott, Lee A. Jackson, Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Arch M. Cantrall, Chief Counsel, John M. Morawski, Special Atty. Internal Revenue Service, Washington, D. C., for respondent.

Before RIVES, Chief Judge, and JONES and WISDOM, Circuit Judges.

JONES, Circuit Judge.

The petitioners, Frank Nelson, Jr., and Lee Etta Nelson, husband and wife, bring before us for review a decision of the Tax Court that there were income tax deficiencies payable by them for the years 1949 and 1950. Since Mrs. Nelson is involved only because of the filing of joint returns with her husband, such references as are made to the Taxpayer will mean Frank Nelson, Jr. The first of two questions presented is whether the Taxpayer was entitled to take deductions of amounts paid for the benefit of a wholly owned corporation as interest and expense, as claimed by the Taxpayer; or whether such payments are deductible only as short-term capital losses on non-business bad debts as asserted by the Commissioner and determined by the Tax Court. The other of the two questions is whether the corporate entity of two corporations, wholly owned by the Taxpayer, should be disregarded as to authorize the Taxpayer to take deductions for the losses and expenses of the corporations. During the years 1946 through 1949 the Taxpayer's sole business activity was in connection with his two wholly owned corporations. The case was submitted on a sipulation and the testimony of three witnesses. The transactions from which the questions arise, and the factual details of them, are considerable in number as appears from the fifty-seven pages of the findings and opinion of the Tax Court. A briefer summary of these facts will suffice for our purposes here.

One of the corporations of which the Taxpayer owned all of the capital stock was Southwest Land Improvement Company, Inc., which will be herein designated as Southwest. The capital stock of this company, which was incorporated in 1945, was $2,000. It was organized to develop Idlewild Hills, an unimproved tract, as a residential subdivision. Southwest started building twenty-five houses. The Taxpayer had advanced some funds to Southwest and it borrowed more from Investors Syndicate, herein called Investors, on a construction loan secured by a mortgage and guaranteed by the Taxpayer. The Taxpayer had also assumed liability for other indebtedness of Southwest. In the latter part of 1946 Southwest was in a bad financial plight. A Chapter X Bankruptcy proceeding was instituted. The Taxpayer concluded he could reduce and perhaps avoid the losses then confronting him by arranging further financing for Southwest and having it complete the project. To procure further funds for Southwest the Taxpayer persuaded his mother and sister who, with the Taxpayer, owned the stock of Frank Nelson Estate, Inc., herein called Estate, to use its credit and that of two of its wholly owned subsidiaries. Investors loaned $421,000 for which Taxpayer, Southwest, Estate, and its two

subsidiaries were jointly and severally liable. The loan was secured by mortgages on the property of each of the four corporations, and made pursuant to an agreement providing for the use of the loan proceeds for Southwest.

The results hoped for did not come to pass and Southwest remained in financial trouble. Further financing was arranged by a mortgage loan from Connecticut General Life Insurance Company, herein called Connecticut, to one of Estate's subsidiaries, Frank Nelson Building, Inc., here referred to as Building, for $125,000. Originally the entry on the books of Building showed an account receivable from Southwest, and the entry on its books showed an account payable to Building. Thereafter Building changed its entry to show its account payable from Taxpayer and Southwest's books then showed its account payable to the Taxpayer. In 1949 another loan was floated. This borrowing was from a Birmingham bank with the Reconstruction Finance Corporation taking a sixty per cent. participation. The note was signed by Southwest, by Estate, its subsidiaries, and by the Taxpayer. It was secured by a mortgage on the property of Southwest and by junior mortgage liens on property of Estate and its subsidiaries. From the proceeds of the loan the balance of the obligation to Investors was paid, legal expense of $15,270.79 incurred in connection with procuring the loan from Investors in 1947 was discharged, and $7,500 was turned over to Southwest. For services in procuring the bank loan, Southwest, the Taxpayer and the others liable for it, agreed to pay William P. Engel the sum of $15,000. The Taxpayer paid a premium of $631.25 for title insurance in connection with the financing by the bank.

On July 9, 1949, an instrument was executed by Southwest and the Taxpayer providing that as an inducement to and consideration for the joinder by Estate and its subsidiaries in the note to the bank, Southwest and the Taxpayer stipulated and agreed that Southwest was the primary obligor on the indebtedness to Investors and to the bank, that the Taxpayer would hold Estate and its subsidiaries harmless from liability and that the assets of Southwest and the Taxpayer should be exhausted before any of the assets of Estate or its subsidiaries were applied to any of the obligations. During the year 1949 most of Southwest's properties were sold and the proceeds were applied on its obligations, including interest to Investors and to the bank. On August 27, 1949, the Taxpayer entered into an agreement with Estate and its subsidiaries resulting in (1) the merger of the two subsidiaries into their parent, Estate, (2) the surrender by the Taxpayer of his stock in Estate, and (3) the agreement of Estate to pay the principal and interest of the Connecticut loan, the balance of the bank loan, the fee owing to Engel, and legal fees owing to two firms. These legal fees had been paid by one of the subsidiaries of Estate in connection with the several mortgage loans. Southwest was dissolved on December 28, 1949, with the Taxpayer, as sole stockholder, taking over its assets. He remained liable for its debts. Estate paid the obligations of Southwest which Estate had undertaken to discharge by its agreement with the Taxpayer. At the time of the agreements of July 9, 1949, and August 23, 1949, there was no reasonable prospect that Southwest would be able to reimburse the Taxpayer for a substantial part of the advances made by the Taxpayer and which he was obligated to make on behalf of Southwest.

The Tax Court had before it a number of controverted matters with respect to the Taxpayer's income tax liability for 1949. Of these we are called upon to review only the question whether the Taxpayer is entitled to deductions from ordinary income the interest on and the fees and expenses incident to the mortgages. These items, claimed as deductions, include the interest on the Connecticut loan, the fee due Engel, and the two items of legal fees, all of which were paid by Estate under its agreement with the Taxpayer. Included also was the ex-

pense incurred in procuring the Connecticut loan, the title insurance premium paid by the Taxpayer, and the legal fee which had been paid from the bank loan. These items aggregate $42,314.33. Also claimed as deductions are interest paid by Southwest to Investors in 1949 from the proceeds of sales, and interest paid to Investors in 1948 from the proceeds of the Connecticut loan which was paid in 1949 under the agreement with Estate. As to these, the Taxpayer states that when these obligations were incurred there was no reasonable prospect that Southwest would be able to discharge any substantial part of them and hence the Taxpayer, Nelson, should be treated as the principal obligor.

The Taxpayer suggests that, if his other theories be rejected, the corporate identity of Southwest should be ignored as of and after the time of its second borrowing from Investors because of Southwest's insolvent condition. An alternative theory is advanced that Southwest and Nelson were co-adventurers in the unfortunate venture which resulted, among other things, in this controversy.

The other of the two corporations of which the Taxpayer was the sole stockholder was Frank Nelson Realty Company, Inc., here referred to as Realty. It was organized with a capital of $2,000. It was formed for the purpose of engaging in the real estate and insurance business. It was contemplated by the Taxpayer that most of Realty's business would be furnished by Southwest. The unfortunate plight of Southwest afflicted Realty with similar financial difficulties. Its operations were made possible by advances from the Taxpayer. It never operated at a profit. It was dissolved on December 28, 1950. The Taxpayer advanced to Realty $10,305.10, which be-

came worthless in 1949, and $21,947.21, which became worthless in 1950. The Taxpayer advanced the theory that Realty should be disregarded as an entity separate from the Taxpayer and that it was and should be treated as the alter ego of the Taxpayer or as his nominee or agent. Under this theory, the Taxpayer contends, the payments made by him should be deductible by him as expenses or as losses sustained on transactions entered into for profit. The Tax Court held that these advances were contributions to capital and that the losses were long-term capital losses. The contention of the Taxpayer is reasserted in his arguments to us.

The Supreme Court has resolved the conflict between Circuits[1] as to the treatment for income tax purposes of the loss sustained upon the payment by an individual as a guarantor[2] of the obligation of a corporation which was insolvent at the time its indebtedness was paid. In Putnam v. Commissioner, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144, it was held that, upon payment of the corporation's debt by the guarantor the obligation was shifted by the operation of the principle of subrogation from the original creditor to the guarantor and, since the corporate debtor was insolvent at the time it followed that the guarantor sustained an immediate loss by reason of the debt being worthless. The guarantor's loss, for income tax purposes, was the loss of a nonbusiness bad debt.

The question as to the allowance of deductions by Nelson of the interest and expense items paid by him as a guarantor or surety depends for its answer upon the scope of the Putnam rule. Prior to the Putnam decision it had been held by the Tax Court that a taxpayer was entitled to an interest deduction for

1. Putnam v. Commissioner, 8 Cir., 1955, 224 F.2d 947; Cudlip v. Commissioner, 6 Cir., 1955, 220 F.2d 565; Edwards v. Allen, 5 Cir., 1954, 216 F.2d 794; Pollak v. Commissioner, 3 Cir., 1954, 209 F.2d 57.

2. It is not unlikely that Nelson was a surety rather than a guarantor as to some

of the obligations of Southwest discharged by him. Davenport & Harris Undertaking Co. v. Roberson, 219 Ala. 203, 121 So. 733; Plant City, Fla. v. Scott, 5 Cir., 1945, 148 F.2d 953. The distinctions between guaranty and suretyship are immaterial in the decision of this case.

interest paid by the guarantor upon the debt of another. Sherman v. Commissioner, 18 T.C. 746. An administrative ruling had been made that interest paid by a guarantor may be deducted "either as an operating expense or as interest, or as a bad debt." S.M.1298, C.B.2, p. 113; Mertens, Law of Federal Income Taxation, Ch. 26, p. 8, § 26.03. Nelson seeks to show that these statements are applicable and sustain his right to deductions as he has claimed them. He undertakes to distinguish the Putnam case and to demonstrate that it does not apply to his situation. The Taxpayer does not here challenge the Tax Court's ruling in so far as it applies to his payments of the principal of the funds borrowed by or for Southwest. As to interest, attorneys' fees and the loan fees, the Taxpayer urges these were separate liabilities; liabilities which, although arising from the same transactions as the liability for principal, were separate from it and independent of it. The interest paid, and the expense items paid, the Taxpayer asserts, were his interest and his expense, and having paid them he is entitle to interest and expense deductions under 26 U.S.C.A. (I.R.C.1939) § 23. The Tax Court rejected these contentions and we think it was correct in so doing.

In the case of United States v. Collier, 5 Cir., 1939, 104 F.2d 420, deductions were allowed for interest paid by a taxpayer upon loans made to him and advanced by him to one of his corporations. In the Collier case it was intimated that if the taxpayer had acted as agent for the corporation in making the loans the tax result would have been different. In this case it was found that the Taxpayer, Nelson, was acting in all of the transactions on behalf of Southwest. The Tax Court's finding so holding is amply supported by the record.

It has been several times said that a deduction for interest cannot be taken unless the interest was owed on an indebtedness of the taxpayer. Guardian Investment Corp. v. Phinney, 5 Cir., 1958, 253 F.2d 326; United States v. Norton, 5 Cir., 1958, 250 F.2d 902;

Commissioner v. Henderson's Estate, 5 Cir., 1945, 147 F.2d 619. The debts, we think, were the debts of Southwest for which Nelson had a secondary liability, and so as to the obligations for interest. See Putnam v. Commissioner, supra. The Regulations relating to the deduction of interest paid read in part:

"(a) Interest paid or accrued within the year on indebtedness may be deducted from gross income * * *.

"(b) Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness. * * *" Reg. 118 § 39.23(b)–(1).

Thus appears an intention that the deduction will not be allowed where the liability is secondary or indirect except in the circumstance stated in the Regulation. Such rule of construction was stated by this Court in Guardian Investment Corp. v. Phinney, supra. The rule, so announced, is applicable here.

Interest is the consideration paid for the use or withholding of money which one person owes to another. Equitable Life Assurance. Society v. Commissioner, 321 U.S. 560, 64 S.Ct. 722, 88 L.Ed. 927; De Moville v. Merchants & Farmers Bank, 237 Ala. 347, 186 So. 704; Daniel v. First National Bank of Birmingham, 5 Cir., 1956, 228 F.2d 803. "Interest" it has been said, "goes with the principal, as the fruit with the tree." Himely v. Rose, 5 Cranch 313, 9 U.S. 313, 3 L.Ed. 111. "Principal and interest," to quote another figurative comparison, "are correlative terms, like parent and child." Commercial National Bank in Shreveport v. Parsons, 5 Cir., 1944, 144 F.2d 231, 240, rehearing denied 5 Cir., 145 F.2d 191, certiorari denied 323 U.S. 796, 65 S.Ct. 440, 89 L.Ed. 635. It is an incident of the principal and when accrued and payable is an indebtedness no different from that of the principal. De Moville v. Merchants & Farmers Bank,

**6**

supra. See also Estes Lumber Co. v. Investors' Syndicate, 223 Ala. 408, 137 So. 31; Scott v. Thomas, 211 Ala. 420, 100 So. 778. The Taxpayer must show himself entitled to the deduction which he claims. He has fallen short in his effort to do so. We reach the conclusion that the obligations of Southwest for interest were debts to the same extent and of the same kind as its obligations to pay principal. From this it follows, we think, that the Taxpayer must be denied an interest deduction under Section 23, and must content himself with the short-term capital loss which the Commissioner has allowed. The same result is reached as to the expense items as they were debts for which Southwest was primarily liable and for which the Taxpayer had a secondary obligation as guarantor or surety. These obligations, incurred for Southwest, are not deprived of their character as guaranteed debts because the arrangements for them were made with the lawyers and others by the Taxpayer.

▉▉ In furthering his effort to escape the impact of the Putnam case by showing that he was a primary obligor rather than a guarantor as to some of the payments made by him, the Taxpayer points to the fact that the loan of Connecticut was made to one of Estate's subsidiaries which advanced the proceeds to Nelson who applied them on the obligation of Southwest. Since Southwest was not a direct participant in this transaction, the Taxpayer reasons that it could not have been the primary obligor and hence the Taxpayer would not have been a guarantor or surety. By similar reasoning the Taxpayer would have us regard him as a principal debtor as to some of the refinanced obligations where the Taxpayer and Southwest became co-makers of the notes given to the creditor. This reasoning, we think, ignores the realities of the transactions. There was a shifting of obligations from one creditor to another as the various refinancings took place with the names of various makers appearing on the instruments. But throughout all of these dealings the indebtedness was the indebtedness of Southwest and the Taxpayer was its guarantor or surety. The relationship between the parties need not appear from the instrument evidencing the debt. Tennessee-Hermitage National Bank v. Hagan, 218 Ala. 390, 119 So. 4; 50 Am. Jur. 910, Suretyship § 10.

Although, as appears from the recital of facts, there are a number of transactions here involved, they all add up to the same conclusions as that expressed by the Taxpayer in a letter written by him to the Internal Revenue Service on May 13, 1955. There he said:

"There was always a definite and specific understanding that Southwest was the principal debtor and that I was the first surety against whom recourse might be had in the event Southwest could not meet its obligations."

We think this is a correct statement and we think the Tax Court properly held that, although the Taxpayer had a direct and primary obligation to the creditors in some of the dealings, he was nevertheless a surety or guarantor as between Southwest and himself in all of the transactions. It may be noted that in Putnam the taxpayer was a co-maker and thus primarily liable to the lender although as between himself and his corporation the taxpayer was a guarantor. Putnam v. Commissioner, 8 Cir., 224 F. 2d 947, 949.

▉▉ The situation here presented does not call for a disregard of the corporate entity of Southwest so as to give to its stockholder Nelson the benefits of the tax deductions here claimed. It is not contended, and could not be plausibly contended, that Southewest had no business purpose, or that it was a sham, or was set up for tax avoidance. See 7 Mertens Law of Federal Income Taxation, Ch. 38, p. 15, § 38.10. Where a corporation is formed and operated for business purposes, it has an identity for tax purposes separate from that of its sole stockholder. National Carbide Corp. v. Commissioner, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779, 10 A.L.R.2d 566; Moline Properties, Inc. v. Commissioner,

319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499. No reason is here apparent for excluding Southwest from the operation of this general rule. The same is true as to Realty. The Taxpayer chose to have these corporations created and put into business enterprises. Their separate entities were of his creation and he cannot escape the tax results that flow from their separate existence.

This opinion need not be further extended by a discussion of the other questions which the Taxpayer has presented. They have been considered and found to be without merit. We are in agreement with the decision reached by the Tax Court and its judgment is

Affirmed.