**LYDIADE INVESTMENT TRUST, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 67 C 51(1).**

United States District Court
E. D. Missouri, E. D.

Aug. 1, 1968.

G. A. Buder, Jr., and Richard O. Roberts, St. Louis, Mo., for plaintiff.

Veryl L. Riddle, U. S. Atty., Irvin L. Ruzicka, Asst. U. S. Atty., St. Louis, Mo., Elliott H. Kajan, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

HARPER, Chief Judge.

This is an action for recovery of corporate income and personal holding company taxes paid by the plaintiff, Lydiade Investment Trust. The Commissioner found deficiencies for the years 1960 and 1961 resulting from his determination that certain amounts received in those years were interest income, offset in part by his allowance of certain payments made by the plaintiff as interest expense. The plaintiff declared and holders, thereby reducing the personal holding company tax deficiencies, and paid the remaining personal holding company and corporate income tax deficiencies to the District Director in St. Louis, Missouri. Thereafter timely claims for refunds were filed and disallowed in full by the District Director, and this suit was timely commenced. The jurisdiction of this court is based on 28 U.S.C.A. § 1346(a) (1).

The facts are largely undisputed since the parties have stipulated many of them and much of the evidence is documentary.

When he died on April 14, 1954, G. A. Buder left outstanding fourteen promissory notes having an aggregate principal amount of $210,000.00, for which he had pledged as collateral certain securities. The notes had been placed with a num-

ber of different banks by St. Louis Livestock Loan Company. After G. A. Buder's death, Livestock, for the purpose of saving the banks any inconvenience, took up each of the notes at maturity, paying the holder the face amount of the particular instrument. Livestock then filed a claim against the Estate of G. A. Buder, which was allowed by the Probate Court of the City of St. Louis on October 5, 1954, as a secured, fifth-class claim, the aggregate amount with interest from the various maturity dates then totalling $212,683.37. On the same day Livestock arranged a loan with Mutual Bank and Trust Company for the amount of the claim, thereby restoring to itself the funds it had put up on the fourteen notes. It gave Mutual its note and executed an assignment of the claim together with the original fourteen notes and the collateral securing those notes.

On February 18, 1955, the Estate paid Livestock the sum of $25,033.70, of which $3,012.99 was interest from October 5, 1954, the date of allowance of the claim, the remainder going to reduce the principal amount of the claim to $190,-662.66. On October 24, 1955, the Estate made another payment in the amount of $4,884.25, covering interest from February 18 to October 17. Although the stipulation does not specifically so state, it would appear that such interest was equal to the sum of monthly interest installments previously paid by Livestock (this was the nature of subsequent payments made to the plaintiff), and the excess was passed on to the bank reducing the principal amount of the loan to what is stated to be the new principal amount of the claim.

In November of 1955, Livestock approached G. A. Buder, Jr., seeking a change in the arrangement since the outstanding note had the effect of restricting its credit. G. A. Buder, Jr., was the executor of his father's estate and was also president of the plaintiff, Lydiade Investment Trust, a corporation with a small number of stockholders who corresponded to the residuary beneficiaries under G. A. Buder's will. A new arrangement was put into effect on November 17th whereby Lydiade took the place of Livestock, substituting its note for the principal balance of $190,662.66 for Livestock's note and taking from Livestock an assignment of the latter's interest in the claim against the Estate subject to the prior assignment to Mutual. On the same day, plaintiff gave Livestock a check for $558.93 representing the interest for the final period of October 17 to November 17, 1955.

The new arrangement remained in effect until February 18, 1960. The note signed by the plaintiff shows that interest was due monthly and the plaintiff's check stubs indicate that it was so paid throughout this period. In addition, the plaintiff made a principal payment of $662.66 on January 17, 1958, thereby reducing the amount of the loan to an even $190,000.00. The stipulation states that "[s]uch repayment on account of principal was made to plaintiff by the Estate of G. A. Buder on July 29, 1960." At the same time, the Estate also paid Lydiade an additional $26,234.77, which is stated to be an amount equal to the total of the plaintiff's interest payments from October 17, 1955, to December 31, 1958. Further payments of $24,725.02 and $5,035.01 were made in 1961, according to the stipulation representing the plaintiff's total payments for the period from January 1, 1959, to May 31, 1961, and from June 1, 1961, to November 30, 1961.

Sometime prior to February 18, 1960, the bank, which as the result of a merger had become Security-Mutual Bank and Trust Company, advised the plaintiff that the arrangement as it stood was no longer satisfactory due to the age of the transaction and the fact that the Estate had never been settled. The plaintiff agreed to a change whereby the Estate would be removed from the picture, and on February 18th it executed and delivered to Security-Mutual a new note for $190,000.00 with securities belonging to it and to G. A. Buder, Jr., personally as collateral. At the same time Security-Mutual gave the plaintiff

a release with respect to all of its interest in the claim and delivered to it the original fourteen notes and the collateral pledged with them.

The plaintiff was on the cash basis during all of the period in question. It deducted none of the regular interest payments it made pursuant to the notes executed by it. The problem it now faces is that in 1964 the Commissioner determined deficiencies against it resulting from its receipt of the corresponding amounts from the Estate in 1960 and 1961, and at that time deductions for the interest payments made on the notes in the years 1955 through 1959 were no longer available on account of the statute of limitations. The plaintiff argues that the monthly interest payments to Mutual represented advances to the Estate paid to Mutual on its behalf, and that consequently the corresponding total amounts later received from the Estate were merely repayment. The core of this argument is that the Estate was the real debtor with respect to the loan from Mutual. The government contends that the Estate had no obligation to Mutual, that instead there were two separate debts, and that as Mutual's obligor and the Estate's obligee the plaintiff both paid and received interest.

The government relies primarily on the form of the transaction, emphasizing that the note of November 17, 1955, was signed by G. A. Buder, Jr., for the plaintiff and does not mention the Estate as a party, and that the claim was assigned for the express purpose of enabling Mutual to hold it as collateral for loans to Livestock, such arrangement being continued when the plaintiff took Livestock's place. The plaintiff stresses that it received none of the proceeds from the loan and had no profit from the transaction, and that the manifest purpose was to enable the Estate to avoid an immediate liquidation of assets. It notes that a guarantor or surety ordinarily cannot deduct interest. Eskimo Pie Corp. v. Commissioner, 4 T.C. 669, aff'd 153 F.2d 301 (3rd Cir. 1946); 2 P-H Federal Taxes ¶ 13,037 (1968).

However, in the government's view the purpose and the ultimate beneficiary are irrelevant since the parties could accomplish the same result, obtaining credit for the Estate, either by means of a direct loan with a guarantee or by using the device of two separate loans. It contends that their intent as shown by the instruments involved was to employ the latter type of arrangement.

There are several reasons, however, why the form of the instruments is not necessarily indicative of the intent the government seeks to establish. The plaintiff in effect inherited the arrangement from Livestock, which was certainly in a debtor-creditor relationship with the Estate when it took up the original fourteen notes. It may be inferred that Livestock wished to have its money back as quickly as possible and, therefore, adopted the simplest arrangement for obtaining a loan when its claim was allowed. In order to avoid putting its name on the note as maker it would have had to ask the executor to sign. It seems fair to say that it is not an ordinary practice for executors to execute promissory notes for the estates they represent and a court order would certainly have been required. See §§ 473.437, 437.460 V.A.M.S.; Crowley v. McCrary, 45 Mo.App. 350 (1891).

Instead, Livestock evidently sought the next best means of obligating the Estate to the fullest extent possible. It turned over to the bank the original fourteen notes and the collateral for them and executed an assignment with respect to the allowed claim. The assignment was made subject to a collateral pledge contract which includes within its terms not only the described property, but also "all dividends thereon, whether cash or stock and extraordinary, as well as ordinary, and all other income, rights and profits therefrom." In addition to this, a separate paragraph was put in the assignment itself authorizing the executor to pay the claim directly to the bank. This indicates that direct payment, to which the bank had a right pursuant to the standard collection

term quoted above, was actually contemplated by the parties to the extent of making special provision therefor. The net result was that without making the Estate a formal party to the loan agreement it was nevertheless made accountable for payment of the loan by assignment of the claim against it and was further expressly authorized to pay the bank directly rather than the original claimant.

The problem of this case, however, arises from the fact that the Estate did not pay Mutual directly. Interest was due monthly, and the Estate was always in the position of making up amounts already paid by Livestock or Lydiade. Not surprisingly, it simply paid them when funds became available and any excess applying to principal was passed on to Mutual. Consequently a direct relationship was never established, although this does not negate the inference that such a relationship was intended.

The arrangement made by Livestock with Mutual will therefore support the conclusion that the former used the quickest and simplest means available to substitute the bank for itself as the actual lender, at the same time doing what it could consonant with the means employed to put the Estate in the position of principal obligor. The fact that G. A. Buder, Jr., signed the new note as president of Lydiade when the plaintiff took Livestock's place in the arrangement shows only that the same motive of simplicity prevailed. To effect a new arrangement at that time making the Estate a party to the note would have required not only a court order but a complete undoing of the original transaction.

For these reasons it seems to the court that the form of the instruments involved should not be given great weight under the special circumstances of this case. Moreover, these instruments relate to only one part of the arrangement in question, and it is the second part—the second of the two separate loans which the government would have the court find—which gives rise to the deficiency assessment here in controversy. The government's position becomes considerably weaker when an attempt is made to establish this second loan.

Livestock, and later the plaintiff as its assignee, were holders of the claim against the Estate, subject to the assignment to Mutual, and the government's argument would seem to be that this was the separate debt under which the Estate's payments were made. An allowed claim under the Missouri Probate Code has the effect of a judgment and bears interest at the legal rate (six percent) unless otherwise provided. See §§ 473.403, 408.040, V.A.M.S. However, the stipulation indicates that the payments made by the Estate which were considered applicable to interest exactly corresponded to the amounts which had been paid by the plaintiff at varying interest rates pursuant to the Mutual loan. Thus the plaintiff was not paying directly on the claim. It would be difficult, moreover, even to infer an agreement calling for interest at the same rate as the bank charged. Not only were the Estate's payments deferred for long periods of time without bearing additional interest, but after January 17, 1958, when the plaintiff made a principal payment as to which the Estate did not make a corresponding payment for over two years, the loan balances, assuming two separate loans, were not the same. In addition, the plaintiff's very first payment (which was made to Livestock) covered interest for a period prior to the commencement of its obligation on the note (October 17, 1955, to November 17, 1955). This particular payment has to be considered an advance, and certainly the more logical interpretation of the other payments is that they were also interest-free advances. No other rational theory will explain the manner in which the plaintiff was reimbursed.

The plaintiff has made an effort to present further evidence supporting this theory to the extent possible under the

circumstances. G. A. Buder, Jr., who acted both as president of Lydiade and executor of the Estate, testified that the plaintiff in no manner denied liability on the note it executed, but the understanding as between it and the Estate was always that the plaintiff acted as "surety" and would be repaid the interest it "advanced". Testimony of this sort is, of course, problematical since the government can hardly refute an agreement said to exist in the mind of one man, but supporting it are the plaintiff's check stubs, which refer to the obligation as the Estate's loan, and the fact that the plaintiff never attempted to take a deduction.

No authorities have been found dealing with a similar three-party loan situation where an estate was involved as the party having use of the funds. The Fifth Circuit Court of Appeals has, however, recognized that a taxpayer can act as an agent for purposes of securing a loan and thus be unable to deduct interest even though his "principal", the ultimate recipient of the funds, does not appear as a party on the instrument involved.

In United States v. Collier, 104 F.2d 420 (5th Cir. 1939), the court stated that the plaintiff, who executed notes and advanced the sums received to various corporations he controlled, might have acted as agent in making the notes; but no one had so testified and the evidence it had before it, entries on the taxpayer's books as well as the notes, showed a loan to him as an individual. In the present case such testimony has been offered and the documentary evidence is not so unequivocal. Furthermore, in Collier the party asserted to be the principal in the agency relationship would have suffered no substantial inconvenience in manifesting itself as such.

In a later case, Nelson v. Commissioner of Internal Revenue, 281 F.2d 1 (5th Cir. 1960), the same court held that facts were presented which were appropriate for application of the agency approach intimated in Collier. Nelson also involved a taxpayer who secured loans for a corporation he controlled and attempted to deduct interest thereon. The court held that none of the payments were interest expense as to him, finding that he acted as agent with respect to all of the transactions involved even though in some instances he signed as co-maker with the corporation and in one instance the corporation did not directly participate in any capacity. It declined to ignore the "realities of the transactions," stating at 281 F.2d 6: "The relationship between the parties need not appear from the instrument evidencing the debt. * * * [W]e think the Tax Court properly held that, although the Taxpayer had a direct and primary obligation to the creditors in some of the dealings, he was nevertheless a surety or guarantor as between [the corporation] and himself in all of the transactions."

Although many factual distinctions can be drawn between Nelson and the present case, it seems to this court that the approach there taken of looking to the relationship between the two parties who are asserted to be the principal obligor should be determinative here as well. If it can be shown that one party intended to act for the other and signed a note as an accommodation to the other, the precise character of his legal liability to the lender should not be controlling. Here there is ample evidence of such a motive, persuasively supported by the manner in which the Estate repaid the plaintiff.

The court, therefore, holds that the funds repaid by the Estate in 1960 and 1961 do not constitute interest income to the plaintiff, and that it is entitled to a refund of $13,032.75, the total of the amounts paid to the District Director pursuant to the deficiency assessments for 1960 and 1961, with interest at six percent per annum from June 21, 1965, the date of payment. The plaintiff is not entitled to a refund for the amounts paid to its stockholders as deficiency dividends since it has paid no tax on these amounts. The government's brief concedes (p. 17) that "its shareholders

would be entitled to a refund or abatement in the amount of income taxes paid, if any were paid, on the receipt of deficiency dividends in 1965."

In light of this disposition of the case, it will be unnecessary to consider the doctrine of equitable recoupment advanced as an alternative ground for recovery in separate counts of the plaintiff's complaint.

This memorandum opinion, together with the stipulation of facts entered into by the parties, is adopted as the court's findings of fact and conclusions of law, and the clerk is directed to enter a judgment for the plaintiff on Count I in the amount of $3,542.81, with interest from June 21, 1965, at six percent per annum, and on Count III in the amount of $9,-489.94, with interest from June 21, 1965, at six percent per annum, and in favor of defendant on Counts II and IV.