Jacob ABDALLA and Mary T. Abdalla, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 78–3039.

United States Court of Appeals, Fifth Circuit. Unit A

June 12, 1981.

Band & Hopkins, H. Book Hopkins, Gretna, La., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Gilbert E. Andrews, Act. Chief, Appellate Sec., Stuart E. Seigel, Chief Counsel, Internal Revenue Service, Crombie J. D. Garrett, Murray S. Horwitz, Jonathan Cohen, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before THORNBERRY, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

This case presents the question whether the availability or amount of a deduction claimed by a taxpayer under I.R.C. § 1374 of the net operating loss of a Subchapter S corporation in which the taxpayer is a holder of capital stock and debt is affected by the fact that on a date (October 26, 1966) during both the taxpayer's taxable year (ended December 31, 1966) and the corporation's taxable year (ended January 31, 1967), the corporation was adjudicated bankrupt and the capital stock and debt in the corporation owned by the taxpayer became worthless. The taxpayer claimed a deduction under § 1374 for the full net operating loss for the corporation's taxable year on his tax return for his taxable year (ended December 31, 1967) during which the corporation's taxable year ended. The Internal Revenue Service disallowed the deduction of the net operating loss in full for the reason that the taxpayer had incurred losses under I.R.C. §§ 165(g) and 166(d) for worthless stock and debt during his preceding taxable year (ended December 31, 1966), which had the effect under I.R.C. § 1016(a)(1) of reducing his bases in his stock and debt to zero during 1966, thereby rendering the net operating loss for the corporation's taxable year (January 31, 1967) nondeductible to the taxpayer under § 1374(c)(2).

The Tax Court, in resolving the interrelationship of a § 1374 net operating loss deduction and the deductions allowed for worthless stock (§ 165(g)) and worthless nonbusiness debt (§ 166(d)) in a situation where the taxpayer and his Subchapter S corporation have different taxable years, held that the worthlessness occasioned by the bankruptcy constituted a disposition of such stock and debt and that the taxpayer could, therefore, deduct under § 1374(c) the fraction of the net operating loss of the corporation allocable to the period from the

beginning of the corporation's taxable year to the date of worthlessness. *Abdalla v. Commissioner*, 69 T.C. 697 (1978). On appeal, the taxpayer urges that he is entitled to claim the entire net operating loss of the corporation for its full taxable year, rather than for the period of the year ended on the date of worthlessness. The Service, having abandoned its position before the Tax Court, has not cross-appealed the Tax Court's holding that the worthlessness constituted a disposition for purposes of § 1374(c) and, indeed, urges that the Tax Court's judgment be affirmed.

Because the Service has not cross-appealed the judgment of the Tax Court, we affirm that judgment. However, we reject the Tax Court's rationale—that worthlessness should be treated as a disposition under § 1374(c)—because that theory presents more problems than it solves. For the reasons set forth below, we are of the opinion that the revision of the provisions of the Internal Revenue Code involved in this case should be left to Congress and that, unless and until Congress acts, these provisions should be applied as they are now written.

## I. THE FACTS

The taxpayer [1] was the owner of 100% of the outstanding capital stock of Abdalla's Furniture Inc. ("Furniture"), a Louisiana corporation. As of October 25, 1966, the basis of his capital stock and the basis of his indebtedness in Furniture were $100,000 and $141,500, respectively. In addition, the taxpayer owned 1,255 of the 1,275 shares of capital stock of Abdalla's Downtown Furniture, Inc. ("Downtown Furniture"), a Louisiana corporation. As of October 25, 1966, the basis of his capital stock in Downtown Furniture was $125,500. Both Furniture and Downtown Furniture used a fiscal year which ended January 31 for purposes of calculating their federal income tax liabilities. Furniture and Downtown Furniture filed properly executed elections in accordance with the provisions of I.R.C. §§ 1371 and 1372 to be taxed as Subchapter S corporations.

The taxpayer was also the president, principal stockholder and chief executive officer of three other corporations, Park Development Corporation ("Park"), Vista Development Corporation ("Vista") and Park Vista Homeowners Corporation, all Louisiana corporations.

Furniture and Downtown Furniture were adjudicated bankrupt on October 26, 1966. The taxpayer and the Internal Revenue Service stipulated that the taxpayer's stock and debt in Furniture and his stock in Downtown Furniture became completely worthless on that date.

For the fiscal year ended January 31, 1967, Furniture and Downtown Furniture had net operating losses of $255,825 and $208,170, respectively.

Prior to the adjudication of bankruptcy, the taxpayer had endorsed two notes of Furniture *in solido*. During his taxable year ended December 31, 1968, the taxpayer paid interest on such notes totaling $10,-650.36, and he deducted that amount on his tax return for 1968. One of these notes was also endorsed by Vista and Park. Each of Vista and Park secured its endorsement of Furniture's liability by a promissory note payable to "bearer." Each such promissory note was, in turn, secured by an attached collateral mortgage executed by the maker of the note.

The taxpayer included a deduction for the net operating losses of Furniture and Downtown Furniture in his individual tax return filed for his taxable year ended December 31, 1967. In his individual tax return filed for his taxable year ended December 31, 1968, he included a deduction for his personal net operating losses resulting from the flow through of these corporate losses carried forward to 1968.

The Service disallowed the net operating losses for the reason that, since the taxpayer's stock and debt in Furniture and his stock in Downtown Furniture had become worthless during the taxpayer's taxable

---

1. Since Jacob Abdalla's wife, Mary T. Abdalla, is party to this proceeding only by virtue of having filed a joint return with her husband, Jacob Abdalla will be referred to herein as the taxpayer.

year ended December 31, 1966, the taxpayer incurred losses during 1966 for worthless stock and debt under §§ 165(g)[2] and 166(d),[3] respectively. Accordingly, the taxpayer was required by § 1016(a)(1)[4] to adjust the bases of his stock and debt to zero in 1966. Having zero bases in the stock and debt at January 31, 1967, he was not entitled to claim any net operating loss, for § 1374(c)(2) limits such deductions to the taxpayer's adjusted bases in his stock and indebtedness.[5] Also, the Service disallowed the deduction for the interest paid by the taxpayer on Furniture's notes.

2. I.R.C. § 165(g), as in effect in 1966, provided as follows:

*(g) Worthless securities.*

*(1) General rule.*

If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

*(2) Security defined.*

For purposes of this subsection, the term "security" means—

(A) a share of stock in a corporation;

(B) a right to subscribe for, or to receive, a share of stock in a corporation; or

(C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.

*(3) Securities in affiliated corporation.*

For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. For purposes of the preceding sentence, a corporation shall be treated as affiliated with the taxpayer only if—

(A) at least 95 percent of each class of its stock is owned directly by the taxpayer, and

(B) more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the corporation in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, and gains from sales or exchanges of stocks and securities.

In computing gross receipts for purposes of the preceding sentence, gross receipts from sales or exchanges of stocks and securities shall be taken into account only to the extent of gains therefrom.

26 U.S.C. § 165(g) (1964).

3. I.R.C. § 166(d), as in effect in 1966, provided as follows:

*(d) Nonbusiness debts.*

*(1) General rule.*

In the case of a taxpayer other than a corporation—

(A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

*(2) Nonbusiness debt defined.*

For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

26 U.S.C. § 166(d) (1964).

4. I.R.C. § 1016, as in effect in 1966, provided in pertinent part as follows:

*§ 1016. Adjustments to basis.*

*(a) General rule.*

Proper adjustment in respect of the property shall in all cases be made—

(1) for expenditures, receipts, losses, or other items, properly chargeable to capital account, but no such adjustment shall be made—

(A) for taxes or other carrying charges described in section 266, or

(B) for expenditures described in section 173 (relating to circulation expenditures), for which deductions have been taken by the taxpayer in determining taxable income for the taxable year or prior taxable years;

. . . .

(18) to the extent provided in section 1376 in the case of stock of, and indebtedness owing, shareholders of an electing small business corporation (as defined in section 1371(b)); . . . .

26 U.S.C. § 1016 (1964).

5. I.R.C. § 1374, as in effect in 1966, provided as follows:

*(a) General rule.*

A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.

*(b) Allowance of deduction.*

The Tax Court, in a decision which was described by one dissenting judge as "Solomonic," held that the onset of worthlessness not only constituted the event which established the worthlessness of the taxpayer's investments for purposes of §§ 165(g) and 166(d), but also could fairly be treated as amounting to a sale or exchange of the stock and debt for purposes of § 1374(c).[6] Having adopted the position that the worthlessness of the taxpayer's stock and debt occasioned by the bankruptcy constituted a disposition of the stock and debt for purposes of § 1374(c), the Tax Court held that the taxpayer was entitled to deduct the net operating losses of Furniture and Downtown Furniture as if he had disposed of his stock in those corporations on the date of the bankruptcy. In so holding, the Tax Court specifically overruled dictum to the contrary in *Levy v. Commissioner*, 46 T.C. 531 (1966). The Tax Court further held that under § 1374(c)(2)[7] the limit on the amount of net operating loss of each corporation which the taxpayer was entitled to deduct was his adjusted bases in the stock and debt of such corporation as of October 25, 1966.

Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)).

(c) *Determination of shareholder's portion.*
 *(1) In general.*
 For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss (computed as provided in section 172(c), except that the deductions provided in part VIII (except section 248) of subchapter B shall not be allowed) for his taxable year in which or with which the taxable year of the corporation ends. For purposes of this paragraph, a shareholder's pro rata share of the corporation's net operating loss is the sum of the portions of the corporation's daily net operating loss attributable on a pro rata basis to the shares held by him on each day of the taxable year. For purposes of the preceding sentence, the corporation's daily net operating loss is the corporation's net operating loss divided by the number of days in the taxable year.
 *(2) Limitation.*
 A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of—
 (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day

before the day of such sale or other disposition), and
 (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation).

(d) *Application with other provisions.*
 *(1) In general.*
 The deduction allowed by subsection (b) shall, for purposes of this chapter, be considered as a deduction attributable to a trade or business carried on by the shareholder.
 *(2) Adjustment of net operating loss carrybacks and carryovers of shareholders.*
 For the purposes of determining under section 172, the net operating loss carrybacks to taxable years beginning before January 1, 1958, from a taxable year of the shareholder for which he is allowed a deduction under subsection (b), such deduction shall be disregarded in determining the net operating loss for such taxable year. In the case of a net operating loss for a taxable year in which a shareholder is allowed a deduction under subsection (b), the determination of the portion of such loss which may be carried to subsequent years shall be made without regard to the preceding sentence and in accordance with section 172(b)(2), but the sum of the taxable incomes for taxable years beginning before January 1, 1958, shall be deemed not to exceed the amount of the net operating loss determined with the application of the preceding sentence.
 26 U.S.C. § 1374 (1964).

6. See note 5 *supra.*

7. See note 5 *supra.*

The Tax Court computed the taxpayer's portion of the net operating losses of Furniture and Downtown Furniture as follows:

Furniture:

| | |
|---|---|
| Net operating loss for the year ended 1/31/67 = | $255,825.00 |
| Net operating loss per day ($255,825 – 365) = | $700.89 |
| Net operating loss for 267 days of year ended 1/31/67 = | $187,137.73 |

Downtown Furniture:

| | |
|---|---|
| Net operating loss for the year ended 1/31/67 = | $208,170.00 |
| Net operating loss per day ($208,170 – 365) = | $570.33 |
| Net operating loss for 267 days of year ended 1/31/67 = | $152,278.11 |
| Taxpayer's share (.9843) of net operating loss for 267 days = | $149,887.34 |

Section 1374(c)(2) limits the deduction available to the taxpayer as follows:

Furniture:

| | |
|---|---|
| Basis in stock | $100,000 |
| Basis in debt | 141,500 |
| | $241,500 |

Downtown Furniture:

| | |
|---|---|
| Basis in stock | $125,500 |
| Basis in debt | 0 |
| | $125,500 |

Since the taxpayer's pro rata share of the net operating loss of Furniture ($187,173.73) was less than the sum of his bases in the stock and debt of Furniture ($241,500), he was entitled to deduct the full loss. In the case of Downtown Furniture, on the other hand, since the taxpayer's pro rata share of the net operating loss ($149,887.34) exceeded his basis in the stock ($125,500), he was entitled to deduct only $125,500 of that loss.

Having held that the taxpayer was entitled to deduct the net operating losses of Furniture through October 25, 1966, in the amount of $187,137.73 pursuant to § 1374, the Tax Court then held that, by operation of I.R.C. § 1016(a)(18),[8] the basis of his

stock was reduced to zero and the basis of his debt to $54,362.27, computed as follows:

| | |
|---|---|
| Net operating loss: | $187,137.63 |
| less basis in capital stock | 100,000.00 |
| | $ 87,137.63 |
| | |
| Basis of indebtedness | $141,500.00 |
| less amount of net operating loss in excess of stock basis | 87,137.63 |
| | $ 54,362.27 |

Under Treas.Reg. § 1.1376–2(a)(3)(i),[9] the foregoing reductions to basis were effective as of October 25, 1966. The Tax Court then held that the taxpayer was entitled to deduct the remaining basis of his debt in the amount of $54,362.27 as a bad debt loss pursuant to § 166(d) for his taxable year ended December 31, 1966, the taxable year in which worthlessness (i. e., bankruptcy) occurred.[10] See Boehm v. Commissioner, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945). Because the dominant motivation of the taxpayer in extending credit to Furniture was not to protect his trade or business of being an employee thereof but was, instead, to protect his capital investment, the loss was characterized as a nonbusiness bad debt and treated under § 166(d) as a short term capital loss. See Miles Production Co. v. Commissioner, 457 F.2d 1150 (5th Cir. 1972). This deduction in turn caused a § 1016(a)(1) adjustment to basis as an item chargeable to the taxpayer's capital account. In summary, the adjustments to basis necessitated by §§ 1016(a)(1) and 1016(a)(18) reduced the taxpayer's basis to zero as of December 31, 1966.

Insofar as the deduction claimed by the taxpayer for the accrued interest in the amount of $10,650.36 paid by him on the

---

8. See note 4 supra.

9. Treas.Reg. § 1.1376–2(a)(3)(i), as in effect in 1966, provided as follows:

(3) Time of reduction. (i) The reduction in the basis of stock provided under section 1376(b)(1) shall be effective as of the close of the corporation's taxable year in which the net operating loss was incurred as to stock which is held at such time and as of the close of the day before disposition if the stock was disposed of prior to that time.

10. The Tax Court recognized that the amount of net operating loss available to the taxpayer cannot be calculated until the corporation's taxable year ends. Until the net operating loss is determined, the amount of basis available for the bad debt loss is an unknown. Therefore, in the factual situation presented here, the bad debt loss for the taxpayer's taxable year ended December 31, 1976, could not be determined prior to the close of the corporation's taxable year ended January 31, 1967.

two notes of Furniture endorsed by the taxpayer *in solido*, the Tax Court disallowed the interest deduction under I.R.C. § 163(a).[11] The Tax Court noted that prior to *Putnam v. Commissioner*, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956), interest paid by a guarantor was deductible under § 163(a). Since *Putnam*, § 163(a) is interpreted to allow an interest deduction where the taxpayer is secondarily liable only if the interest is paid in connection with a real estate mortgage and the taxpayer is the legal or equitable owner of the property. *See Nelson v. Commissioner*, 281 F.2d 1 (5th Cir. 1960). The Tax Court held that even though the taxpayer was liable *in solido* on the debt of Furniture and was thus primarily liable vis-a-vis the creditor, he was secondarily liable vis-a-vis Furniture and the interest was therefore not deductible under § 163(a).

As an alternative basis for the interest deduction, the taxpayer contended that he fulfilled the *Nelson* test as the legal or equitable owner of property mortgaged to secure one of the Furniture notes. He argued that as a shareholder or transferee of Park and Vista (each of which had endorsed the note and secured its liability by a note payable to "bearer," which was in turn secured by a collateral mortgage on its property), he was the legal or equitable owner of the property mortgaged to secure that note. The Tax Court held that under those circumstances, even if the property were held to be legally or equitably owned by the taxpayer, it did not serve as collateral for the debt, but instead as collateral for the note collateral. The Tax Court ruled that this relationship was too remote to support the further expansion of § 163(a) that would be necessary to encompass the situation.

Seven Tax Court judges dissented from the Tax Court's judgment in this case. Judge Hall, with Judges Featherston and Wilbur agreeing, would have permitted the taxpayer to deduct the full amount of the operating losses of Furniture and Downtown Furniture for the taxable year ended January 31, 1967, rather than 267/365 of those losses as permitted by the majority. Judge Wiles, with Judges Fay, Quealy and Goffe agreeing, would have permitted the taxpayer to deduct only the capital losses under §§ 165(g) and 166(d) occasioned by the worthlessness of his stock and debt in Furniture and his stock in Downtown Furniture and, since those losses would have eliminated his basis, would have disallowed the deductions for the net operating losses in full.

## II. THE NET OPERATING LOSS ISSUE

On appeal, the taxpayer adopts the position urged by Judge Hall in dissent—namely, that he should be entitled to a deduction under § 1374 for the full amount of the net operating losses of Furniture and Downtown Furniture for their taxable years ended January 31, 1967, to the extent of the taxpayer's adjusted bases in the stock and any debt of the corporations to him.

The taxpayer acknowledges, as did Judge Hall, that Congress simply failed to deal specifically with the order in which net operating losses and capital losses are to be taken. The taxpayer argues that if we look to the general congressional purpose underlying Subchapter S, it is clear that the § 1374 ordinary loss deduction should be given preference over the deductions for capital losses resulting from the worthlessness of the stock and debt of the corporations. The taxpayer cites the legislative history of the Technical Amendments Act of 1958,[12] in which Subchapter S was added to the Internal Revenue Code of 1954 (the "Code"). The Senate Report on H.R. 8381 states:

---

11. I.R.C. § 163(a), as in effect in 1966, provided as follows:

 *(a) General rule.*

 There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

26 U.S.C. § 163(a) (1964).

12. Pub.L.No.85–866, § 64, 72 Stat. 1606, 1650, *reprinted at* 1958–3 C.B. 254, 298, *and at* [1958] U.S.Code Cong. & Ad.News 1925, 1980.

Under this provision the net operating losses of the corporation currently also are passed through to the shareholder. Thus, at the corporate level where this special treatment is elected, there is no carryover or carryback of operating losses to or from a year with respect to which this special treatment has been elected. *At the individual level these "distributed" corporate losses are to be treated in the same manner as any loss which the individual might have from a proprietorship*; that is, they first offset income of the individual, in that year (whether or not derived from another business) and then any excess of these losses may be carried back and offset against the individual's income in prior years and, if any losses still remain, they may be carried forward and offset against his income in subsequent years.

S.Rep.No.85–1983, 85th Cong., 2nd Sess. —— (1958), *reprinted at* 1958–3 C.B. 922, 1009, *and at* [1958] U.S.Code Cong. & Ad. News 4791, 4877 (emphasis added). The Conference Report echoes the Senate Report in describing the treatment of corporate losses as similar to the treatment which would obtain if the business were a sole proprietorship:

The net operating losses of the small business corporation are passed through currently to the shareholder. There is no carryover or carryback at the corporate level of operating losses to or from a year with respect to which this special treatment has been elected. *At the individual level these corporate losses are to be treated in the same manner as any loss which the individual might have from a proprietorship.*

Conf.Rep.No.85–2632, 85th Cong., 2d Sess. —— (1958), *reprinted at* 1958–3 C.B. 1188, 1223, *and at* [1958] U.S.Code Cong. & Ad. News 5053, 5072–73 (emphasis added).

The taxpayer further argues that the only limitation in the Code on the taxpayer's right to take advantage of the net operating loss deduction provided by § 1374 is that set forth in § 1374(c)(2), which limits the loss to the amount of the taxpayer's adjusted bases in the stock and debt of the corporation owned by him. The taxpayer argues that the worthlessness of the stock and debt does not, as a matter of fact, constitute a sale of the stock and debt. That being so, there is no support in the Code for importing into the transaction the limitation on the amount of losses that the taxpayer may claim which is applicable under § 1374(c) in the event of a sale. Instead, the taxpayer urges, the proper procedure is to permit a § 1374 deduction for the full taxable year's losses, and to reduce the taxpayer's bases in the stock and debt accordingly at the end of the taxable year, and to limit the losses for worthless stock and debt to any basis unrecovered after all available § 1374 deductions have been taken and the required § 1016(a)(18) adjustments to basis have been made.

The Service agrees with the taxpayer that it is clear that Congress never considered the interplay of §§ 165, 166 and 1374. The Service defends the decision of the Tax Court to treat the bankruptcy of the corporations, and the resulting worthlessness of the stock and debt, as a disposition of the stock and debt as the only supportable means, under the literal wording of the Code, of reconciling the Subchapter S loss pass through provisions with the worthless stock and debt provisions. The end result, according to the Service, is equitable to the taxpayer in that he is permitted to deduct a substantial amount (267/365) of each corporation's net operating loss in the year of bankruptcy. Further, treating worthlessness as a disposition for Subchapter S purposes is consistent with both §§ 165(g) and 166(d), which treat worthlessness as a loss from the *sale* or *exchange* of a capital asset. Moreover, as the Tax Court noted, once worthlessness has occurred, the taxpayer has as a practical matter lost the economic benefits of his stock and debt ownership in a manner similar to that which would obtain if he sold the stock and debt. After adjudication of bankruptcy, all that remains to the stockholder and debt holder is the right to receive distributions, if any, from the trustee in bankruptcy, in the same manner as he would receive pro-

ceeds from the sale of his stock and debt. His ability to control corporate affairs, which are in the hands of the trustee, has diminished almost to zero.

Both the taxpayer (adopting Judge Hall's position) and the Service (adopting the Tax Court's position) premise their arguments on the proposition that Congress did not consider in drafting §§ 165, 166 and 1374 the problem which arises when the taxpayer's taxable year is different from that of his Subchapter S corporation. Each party argues, on the basis of Congress' general intention to treat losses of Subchapter S corporations as if they were losses of proprietorships, that had Congress considered the problem it would have preferred the deduction for net operating losses allowed in § 1374 over the deductions for worthless stock and nonbusiness debts allowed in §§ 165(g) and 166(d); the parties differ only in the extent to which they think Congress would have allowed a net operating loss to be deducted prior to the worthlessness deductions, the taxpayer arguing that Congress would have allowed a deduction for the full amount of the net operating loss for the corporation's taxable year, and the Service arguing that Congress would have prorated the amount so as to allow a deduction for the net operating loss up to the date of worthlessness, a result which is conveniently reached by the Tax Court's treatment of worthlessness as a disposition under § 1374(c).

The result reached by a literal reading of the Code does indeed appear contrary to Congress' general intention to treat net operating losses of Subchapter S corporations as net operating losses of proprietorships are treated, for the taxpayer is deprived of the benefits of such a deduction by the fortuitous way in which his taxable year differs from that of his Subchapter S corporations. When the § 1374(b) requirement that a net operating loss be recognized during the taxpayer's taxable year in which the corporate year ends is read along with the §§ 165(g) and 166(d) requirement that worthlessness be recognized in the year in which it occurs, the result is that a taxpayer whose taxable year differs from that of his

Subchapter S corporation will be required to recognize the worthlessness deductions first if the corporation's taxable year ends after the taxpayer's taxable year in which worthlessness occurs, but will be required to recognize the net operating loss first if worthlessness occurs in the taxpayer's taxable year following the year in which the corporate taxable year ends. The chance way in which this rule works is illustrated by the outcome that would result from a reversal of the dates of worthlessness and of the conclusion of the corporate years in this case: had Furniture's and Downtown Furniture's taxable years ended two months *before* the taxpayer's taxable year, and had worthlessness occurred one month *after* the end of the taxpayer's year, then the bulk of the net operating losses at issue in this case would have been deductible by the taxpayer, albeit in an earlier year.

One may reasonably assume, therefore, that Congress did not consider the problem caused by different tax years of the taxpayer and his corporation, and it may very well be true that had Congress considered this question it would have adopted one of the approaches suggested by the parties to this suit. The difficulty with both the taxpayer's and the Service's argument, however, is that the result challenged in this case is *unambiguously* required by the Code. In *Boehm v. Commissioner*, 326 U.S. 287, 292, 66 S.Ct. 120, 123, 90 L.Ed. 78 (1945), the Supreme Court held that "the plain language of the statute and of the Treasury interpretations having the force of law" requires the worthlessness of corporate stock to be recognized in the taxable year in which it is in fact sustained. Since the parties have stipulated that worthlessness occurred on October 26, 1966, the Code clearly requires the taxpayer's losses under §§ 165(g) and 166(d) to be recognized in his taxable year ended December 31, 1966. The basis in the taxpayer's stock must therefore be adjusted downward pursuant to § 1016(a)(1), thereby leaving the taxpayer with a basis of zero in both his stock and his nonbusiness debt at the end of 1966. Since his corporations' taxable years ended

on January 31, 1967, the clear language of § 1374(c)(1) requires the corporations' net operating losses to be deducted, if at all, during the taxpayer's taxable year ended December 31, 1967; at that point the taxpayer would have no basis in either the stock or the debt and therefore would be barred by § 1374(c)(2) from deducting any portion of the corporations' net operating losses.

Whatever the harshness of the result now mandated by the Code, and however inconsistent it may be with the rationale underlying the Code provisions regarding Subchapter S corporations, there is no serious doubt that this result is in fact what the literal provisions of the Code given their ordinary meaning clearly require. Therefore we are not called upon in this case to interpret an ambiguous statute or to harmonize conflicting congressional acts. What we are called upon to consider is a much more serious and difficult invasion of Congress' legislative prerogative. Both parties ask this court to avoid a result which the statute clearly requires; we are asked to rewrite, in effect, the relevant provisions of the Code.

 There is in fact substantial authority for a limited judicial revision of clear statutory provisions. Although neither party cites such authority and the Tax Court makes no reference to it, a long-standing line of precedent establishes the principle that a statute may be interpreted and enforced in a manner contrary to its literal and unambiguous wording when the intent of the legislative scheme clearly indicates a result contrary to that dictated by the statute. The most well-known case in this line is *Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). In that case the Supreme Court held that a statute prohibiting the importation of aliens under contracts to perform

labor did not apply to a contract to import a Christian minister, despite the literal reach of the statute over all providers of "services," and despite the statute's specific exceptions for certain other types of laborers. As the Court explained:

> [W]e cannot think that Congress intended to denounce with penalties a transaction like that in the present case. It is a familiar rule that a thing may be within the letter of the statute and yet not within its spirit, nor within the intention of its makers.

143 U.S. at 459, 12 S.Ct. at 512. The Court relied for this proposition on a number of early American and older English cases and cited several colorful examples of its application. The Court referred, for instance, to a medieval Bolognian law which stated "that whoever drew blood in the streets should be punished with the utmost severity" but was nevertheless held inapplicable to a "surgeon who opened the vein of a person that fell down in the street in a fit." Similarly, the Court cited a statute of Edward II which unqualifiedly made escape from prison a felony but nevertheless was held not to extend to a prisoner who breaks out when the prison is on fire: "for he is not to be hanged because he would not stay to be burnt." 143 U.S. at 461, 12 S.Ct. at 512. The Court also relied heavily on *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 486, 19 L.Ed. 287 (1869), in which the Court held that a statute prohibiting interference with the delivery of the mail did not prohibit the arrest for murder of an on-duty mail carrier. Although the roots of the *Holy Trinity* principle are indeed old, that principle is no less alive now than it was in medieval times or in 1892, when *Holy Trinity* was written; it has, in fact, been applied in a wide variety of contexts in recent years.[13]

---

13. *See, e.g., United Steelworkers of America v. Weber*, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726–27, 61 L.Ed.2d 480 (1979) (Title VII prohibition against discrimination "because of ... race" held not applicable to industrial affirmative action plan); *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 619, 87

S.Ct. 1250, 1255, 18 L.Ed.2d 257 (1967) (union action literally within the scope of a particular unfair labor practice under the National Labor Relations Act may nevertheless be without the Act where Congress did not intend such a result); *Wisconsin Higher Education Aids Board v. Lipke*, 630 F.2d 1225, 1229–30 (7th Cir. 1980)

This does not mean that courts should lightly rewrite statutes to accord more fully with Congress' presumed intentions. To the contrary, the Supreme Court has carefully limited the reach of the *Holy Trinity* principle. In *Crooks v. Harrelson*, 282 U.S. 55, 59–60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930), the Court upheld the literal interpretation of an estate tax provision which included property in the estate of the decedent only to the extent that his interest in it was subject to the "payment of the charges against his estate *and* the expenses of administration." Despite strong evidence that the statute was intended to read in the disjunctive, the Court rejected the relevance of *Holy Trinity* and applied the statute as written:

> [A] consideration of what is [said in *Church of the Holy Trinity*] will disclose that the principle is to be applied only under rare and exceptional circumstances. The illustrative cases cited in the opinion demonstrate that to justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense. And there must be something to make plain the intent of Congress that the letter of the statute is not to prevail.

282 U.S. at 60, 51 S.Ct. at 50. In a more recent case the Supreme Court has repeated this limited view of the *Holy Trinity* principle. In *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Court was called upon to decide whether the Endangered Species Act of 1973, which required "such action [as is] necessary" to insure that federal projects do not jeopardize the continued existence of endangered species (in this case the snail

darter fish), required the TVA to halt its work on a nearly-completed dam until such time as Congress enacted an exception to the Act for the dam. The Court upheld the literal requirement of the statute despite the seemingly inequitable and probably unintended result in the case. Justice Powell relied in part on *Holy Trinity* in his dissent, 437 U.S. at 204, 98 S.Ct. at 2306, and the majority responded in a footnote to the opinion by reiterating the restricted role of the *Holy Trinity* principle as explained in *Crooks v. Harrelson*, 437 U.S. at 187 n.33, 98 S.Ct. at 2298 n.33. *Cf.* 437 U.S. at 204 n.14, 98 S.Ct. at 2307 n. 14 (Powell, J., responding to the majority's *Holy Trinity* footnote).

Whatever the precise reach of this principle, we note that it has been applied on occasion in tax cases to avoid an unambiguous result commanded by the Code. For example, the Court of Appeals for the Fourth Circuit relied on *Holy Trinity* in *Alvord v. Commissioner*, 277 F.2d 713, 719 (4th Cir. 1960), in which the court refused to enforce a Code provision including the undistributed income of a foreign personal holding company in the taxable income of its owner, in a situation in which the United States government effectively prohibited the distribution. The statute was intended to force the distribution of income by U.S.-owned foreign holding companies that might otherwise accumulate the income so as to evade United States taxes; where the United States had itself prohibited the distribution, the purpose of the statute was not served and the provision acted to penalize the taxpayer for conditions beyond his control. A similar problem arose in *Knight Newspapers v. Commissioner*, 143 F.2d 1007, 1010 (6th Cir. 1944). Although a de-

---

(provision in Bankruptcy Reform Act of 1978 repealing as of November 6, 1978 the old Act's provision respecting the non-dischargeability of student loans, read along with similar non-dischargeability provision operative under new Act as of October 1, 1979, not read literally to allow an eleven month gap, especially in light of an amendment to the Act curing the gap as of August 14, 1979); *Bell & Howell Co. v. NLRB*, 598 F.2d 136, 145 (D.C.Cir.), *cert. denied*, 442 U.S. 942, 99 S.Ct. 2885, 61 L.Ed.2d 312 (1979) (although National Labor Relations

Act provision respecting the holding of elections where the Board finds a question of representation to exist is mandatory, certification may be denied where inconsistent with the purposes of the Act); *United States v. Mendoza*, 565 F.2d 1285, 1288–89 (5th Cir.), *vacated on other grounds*, 581 F.2d 89 (1980) (*en banc*) (Fed.R.Crim.P. 35 120-day limit for acting on defendant's motion to reduce sentence does not bar action when delay not caused by defendant).

clared dividend which was rescinded in the following year was to an accrual basis taxpayer clearly undistributed net income when declared and therefore taxable in the first year, the court held that the income was *not* taxable where it was subject to a personal holding company surtax, since the surtax could not be recovered by a deduction in the second year. Relying on *Holy Trinity*, the court explained that the Code provision making the dividend taxable when declared was implicitly premised on the taxpayer's ability to deduct the amount of the dividend if it were subsequently rescinded before actually distributed; since the Code did not allow the surtax to thus be recovered, the application of the statute would tax income to which the taxpayer was not entitled—a result which obviously was not intended by Congress. *See also Helvering v. Owens*, 305 U.S. 468, 59 S.Ct. 260, 83 L.Ed. 292 (1939) (although not citing *Holy Trinity*, holding that the basis for calculation of a casualty loss is market value, despite a Code provision defining basis as cost less adjustments). The Tax Court itself has relied on *Holy Trinity* to avoid a result contrary to Congressional intent but nevertheless following from unambiguous Code provisions. *See Carson v. Commissioner*, 71 T.C. 252, 262 (1978) (statutory definition of "gift" as "any transfer for less than an adequate and full consideration in money or money's worth" does not include political contributions); *Focht v. Commissioner*, 68 T.C. 223, 239–42 (1977) (Wilbur, J., concurring) (transfer of assets and liabilities of the taxpayer's sole proprietorship to his wholly-owned corporation is not a taxable exchange, despite Code § 357 (which includes as taxable gain the excess of liabilities assumed by the corporation plus liabilities to which the property is subject over the total adjusted basis of the property transferred), where the transferred assets (accounts payable) could not be recognized as a deduction since the taxpayer had used a cash-basis accounting system); *International Trading Co. v. Commissioner*, 57 T.C. 455, 461 (1971), *reversed*, 484 F.2d 707 (7th Cir. 1973) (corporation holding vacation property for the personal use of its share-holders may not deduct a capital loss under Code § 165(a), despite the fact that that section, unlike § 165(c) (losses allowable to individuals), does not contain an exception for property not used in a trade or business, or in a transaction for profit, or for losses arising from casualties; "it was simply assumed [by the drafters of the statute] that losses by corporations would arise out of [their] trade or business").

We have serious doubts whether the conflict between the operation of the Code in this case and the presumed intention of Congress to treat net operating losses of Subchapter S corporations as are losses of proprietorships is, as *Crooks v. Harrelson* requires, an "absurdity ... so gross as to shock the general moral or common sense." *See International Trading Co. v. Commissioner*, 484 F.2d 707 (7th Cir. 1973) (reversing the Tax Court's application of *Holy Trinity* to a capital loss allowed by § 165(a) to a corporation holding vacation property for the personal use of its shareholders). We need not reach this question of legislative intent, however, for there is a more fundamental distinction between the sort of judicial action taken in the *Holy Trinity* line of cases and that requested by the parties in this case. Each of the tax cases discussed or cited above for its application of the *Holy Trinity* principle deals with a relatively simple choice between enforcing and not enforcing some particular literal provision of the Code, or between applying a provision literally or instead with some straightforward modification of its language. In *Alvord, Knight Newspapers* and *Focht*, the courts refused to enforce statutory provisions which would have taxed income which on the facts of those cases was obviously not intended to be taxed. In *International Trading Co.*, the court refused to allow a deduction which was allowed by the literal terms of the Code only because of Congress' inadvertence in failing to add a clearly intended limiting phrase. And in *Owens* and *Carson*, the courts modified statutory definitions where some alternative to the literal language of the Code was obviously intended to apply in the particular circumstances at issue.

No such simple or straightforward solution is available in this case, for the issues do not revolve around any single statutory rule or definition which can be changed for the taxpayer's benefit but left intact for other purposes. The taxpayer lost his net operating loss deduction because of the complicated interrelationship among §§ 165(g), 166(d) and 1374 of the Code. In order to remedy the taxpayer's resultant disadvantage, these sections must be rewritten into a new scheme which would somehow interact to the taxpayer's advantage. Any such broad-based revision would affect not only those in the taxpayer's unusual situation, however, but also would affect those taxpayers for whom the Code now operates as it was intended.

Consider first the rule adopted by the Tax Court and supported on appeal by the Service. The Tax Court treated the bankruptcy of the taxpayer's Subchapter S corporations as a disposition of his stock and debt under § 1374(c), a treatment which gives the taxpayer in this case a prorated net operating loss deduction for the portion of his taxable year preceding the adjudication of bankruptcy. That result in this case seems fair to the taxpayer and consistent with Congress' intentions. What the Tax Court failed to consider was the operation of the rule in what is undoubtedly a common situation—that in which the taxpayer's taxable year (ended December 31) exactly coincides with that of his Subchapter S corporation. If the Code were applied as written, such a taxpayer would in the year of his Subchapter S corporation's bankruptcy accrue both the net operating loss deduction and the worthlessness deduction. Since no Code provision states the order in which these deductions should be taken, we would have to resort to legislative intent to solve what would then be a simple "stacking" question; given the congressional purposes on which both parties so heavily rely in this case, we presume that the net operating loss deduction would be taken—in its entirety—before the worthlessness deduction. The "disposition" rule adopted in this

case by the Tax Court would, however, limit the taxpayer to a prorated share of net operating losses up to the date of bankruptcy. Instead of receiving a full net operating loss deduction, as the Code would seem to allow, the taxpayer would receive only a portion of the deduction, and that portion would decrease as bankruptcy occurred earlier in the year. In effect, the Tax Court's rule would in the common situation of coinciding taxable years operate contrary to what both parties argue is the intention of Congress. The identical problem arises where the taxpayer's taxable year differs from that of his Subchapter S corporation in the opposite order from that which occurred in this case, i. e., where the corporate year ends shortly before the taxpayer's year. The approach adopted by the Tax Court would in that case, as in the case of coinciding years, allow only a prorated portion of net operating losses where bankruptcy occurs during the taxpayer's taxable year, despite the fact that the corporation's taxable year having ended during the taxpayer's taxable year would seem by virtue of § 1374(b) to entitle the taxpayer to deduct the full amount.

An additional difficulty with the Tax Court's "disposition" rule arises from the Tax Court's failure to consider the variety of ways in which corporate stock and debt may become worthless. Here worthlessness follows from bankruptcy, but worthlessness may also follow, for example, from insolvency alone. The Tax Court places some reliance on the fact that at bankruptcy the taxpayer surrendered control of his corporations to the bankruptcy trustee, much as a seller would surrender control to a buyer. It is unclear whether the Tax Court would apply a different rule where, as in the case of insolvency, control of the corporation is not effectively transferred by the taxpayer. If the court did intend to limit its holding to cases in which worthlessness is occasioned by bankruptcy, then an important distinction arises under § 1374 between taxpayers whose Subchapter S corporations are adju-

dicated bankrupt and those whose corporations become worthless for some other reason; that distinction, however, is nowhere made in the relevant portions of the Code.[14]

14. A far more complicated problem with the Tax Court's solution is touched upon, but not developed, in Judge Hall's dissent. She notes the fact that § 165(g) provides that if a security which is a capital asset in the hands of a taxpayer becomes worthless during a taxable year, the loss resulting therefrom shall be treated, for purposes of subtitle A (which covers income taxes generally), as a loss from the sale or exchange of a capital asset on the last day of the taxable year. Judge Hall urged that if this provision is applicable, as the Tax Court held, then the taxpayer's share of each corporation's net operating loss should be prorated to December 31, the last day of his taxable year, and not simply to the date of the bankruptcy. At oral argument, we asked the parties to file supplemental briefs addressing that alternative.

The taxpayer, while continuing to urge that he be entitled to deduct all the net operating losses of the corporations, viewed Judge Hall's alternative as better for his situation than the position taken by the Tax Court, although he offered no detailed explanation for this view. The Service agreed that if § 165(g) is applicable, the last day of the taxpayer's taxable year (December 31, 1966) should be used as the date of "sale" in calculating the taxpayer's pro rata share of the net operating loss of each corporation for purposes of § 1374(c). The Service noted that since the Tax Court relied on § 165(g) to hold that a disposition amounting to a sale or exchange occurred for purposes of § 1374, consistency dictates that it should also use § 165(g) to determine *when* the stock was sold or exchanged for purposes of § 1374. This would forestall questions, and potential litigation, considering the exact date on which a taxpayer's stock became worthless, because so long as the stock became worthless during the year, a taxpayer could always use the last day of his taxable year in calculating his pro rata portion of the net operating loss.

The Service went on to point out, however, that if the last day of the taxpayer's taxable year is used as the date of "sale" for purposes of § 1374(c) the taxpayer in this case would not benefit, but would in fact suffer. The reason for this is that there is a difference in the wording of § 165(g), which treats the loss arising from the worthlessness of stock as a loss on the last day of the taxable year, and the wording of § 166(d), which treats a loss from worthless debt as a loss from the sale or exchange of the debt "during the taxable year." There is no reference in § 166(d) to "the last day of the taxable year." Thus, the Service noted, the date of worthlessness of debt should be the date of its disposition, and at that point the taxpayer's basis in the debt would be reduced, by virtue of § 1016(a)(1), to zero by virtue of the loss.

In *Cornelius v. Commissioner*, 494 F.2d 465, 471 (5th Cir. 1974), the taxpayers had loaned $215,000 to their Subchapter S corporation in 1966. That same year, the corporation sustained a net operating loss of almost $246,000, and the taxpayers deducted their proportionate portions of that loss on their 1966 returns. Under § 1376(b), their basis in the corporation's capital stock was wiped out, and their basis in the debt was reduced by some $144,000. In the spring of 1967, the corporation repaid the loans in full; but in the fall of 1967, the taxpayers loaned another $175,000 to the corporation. We affirmed the Tax Court's holding that because the taxpayers' basis in the debt had been lowered as of the end of 1966, the repayment of the loan resulted in recognition of income in 1967 equal to the amount by which the basis had been reduced. In so doing, we rejected the taxpayers' argument that the Tax Court should have netted out the repayment of $215,000 in the spring of 1967 against the additional loan of $175,000 in the fall of 1967, which would in effect treat the corporation's debt obligations as an "open account" whose fluctuations should be netted out for tax purposes at the end of the taxable year. The crucial factor we cited in rejecting that argument was that the loans were repaid in full each spring, bringing the balance in the notes payable account to zero.

The focus in *Cornelius* on the moment at which the loans were repaid in full has implications for the case at bar. The disposition of a debt constitutes a completed transaction; that disposition is every bit as discrete an event as repayment in full of a debt. *Cornelius* teaches that in dealing with discrete, completed events affecting the debts of Subchapter S corporations to their shareholders, the actual timing of those events is not casually to be ignored. *See also Von Hoffman Corp. v. Commissioner*, 253 F.2d 828, 830–31 (8th Cir. 1958) (taxpayer sold his stock in near-bankrupt corporation, retaining demand note for $65,000; after determining that demand note was nearly worthless, taxpayer sold note for $500 to the purchaser of the stock rather than discharging corporation's liability on the note to the extent of $64,500; held, taxpayer could not claim $64,500 bad debt deduction, but was limited to claiming loss on sale of long-term capital asset because taxpayer did not charge off the $64,500 *before* the sale); *accord, Mitchell v. Commissioner*, 187 F.2d 706, 707 (2d Cir. 1951).

If we apply the position urged by Judge Hall, with the modification urged by the Service, to the facts of this case, the taxpayer's basis in the stock of Furniture at both October 25, 1966 and December 31, 1966, was $100,000. His basis in the debt of Furniture at October 25, 1966, was $141,500. The Tax Court, in treating the worthlessness as having occurred on October 26, 1966, held that the portion of the net operating loss which the taxpayer was entitled to claim was $187,137.73 ($^{267}/_{365}$ths of the net

The approach urged by Judge Hall and adopted by the taxpayer on appeal would, unlike the Tax Court's "disposition" rule, allow a taxpayer to deduct the net operating losses of a Subchapter S corporation no matter how the corporation's taxable year differed from his own and regardless of the particular cause of worthlessness. Judge Hall seems to treat the conflict between net operating losses and worthlessness deductions as a "stacking" problem, i. e., as a question involving the order in which deductions simultaneously allowed by the Code should be taken. Since she believes Congress to have preferred the net operating loss deduction, she argues that that deduction should be taken first. This approach would be a reasonable solution if "stacking" were indeed the problem (which, as we have discussed, would be the case if the taxpayer's year ended on the same date as did that of his Subchapter S corporation), but in this case the Code clearly requires the worthlessness deduction to be taken in the taxpayer's first taxable year and the net operating loss to be taken, if at all, in the second.

Judge Hall's solution creates serious problems in this context, for the Code does not provide for a mechanism by which a deduction accruing in a later year can be given preference over a deduction accruing in an earlier year. In order to count the net operating losses (recognizable in 1967) before the worthlessness deductions (recognizable in 1966), we would have to adopt one of two possible reporting rules, neither of which is consistent with the scheme already established by the Code. First, we could require, in accordance with *Boehm v. Commissioner*, that the worthlessness deductions be reported in the year in which worthlessness occurs, but allow the taxpayer's tax return for that year to be somehow "held open" until the corporation's taxable year ends and the net operating losses are known. Once those losses are determined, we could then allow the taxpayer either to deduct them in the first year, ahead of the worthlessness deductions (which would require us to ignore the § 1374(b) requirement that a net operating loss be deducted in the taxpayer's taxable year in which the corporation's taxable year ends), or we could instead allow the taxpayer to claim, in the first year only so much of the worthlessness deductions as will leave an adequate basis against which to deduct the net operating losses recognizable in the following year (which would require us to ignore the rule of *Boehm v. Commissioner* to the extent of the worthlessness deductions not taken). Second, we could create an exception to the rule of *Boehm v. Commissioner* and thereby allow the worthlessness deductions to be "held over" into the taxpayer's taxable year in which the net operating losses are recognizable.

Both of these options create serious reporting problems. While in this case the corporations' taxable years ended only one month after the taxpayer's, which means

---

operating loss for the year ended January 31, 1967). Applying the provisions of § 1374(c)(2) to that deduction, and treating October 25, 1966, as the date on which the taxpayer's adjusted basis in his stock and debt was to be determined, the taxpayer was entitled to deduct the full net operating loss of Furniture in the amount of $187,137.77, since the sum of his basis in his stock and debt in Furniture at October 25, 1966 ($241,500) exceeded that amount. If we adopt Judge Hall's position, and with the further qualification that the same treatment is not available for the debt as is available for the stock under § 165(g), then the taxpayer's basis in the debt of Furniture is reduced to zero on October 26, 1966. While the taxpayer's pro rata share of the net operating loss of Furniture would increase to $\frac{334}{365}$ths of the net operating loss for the year ended

January 31, 1967, or $234,097.26, the taxpayer's deduction would be limited to the sum of his adjusted basis in his stock of Furniture at December 31, 1966 ($100,000) and his adjusted basis in his debt of Furniture at such date ($0), or $100,000. As a result, the amount of the net operating loss which he is permitted to deduct decreases from $187,137.77 to $100,000.

While the position urged by Judge Hall, as modified by the Service, would have certain advantages in situations other than those presented by this case, it would create the further anomaly of a difference in tax treatment between the taxpayer who is a holder of stock in a bankrupt Subchapter S corporation and a taxpayer who is a holder of both stock and debt in a bankrupt Subchapter S corporation.

that the net operating losses might well have been known in time to incorporate them in a return "held open" from the previous year, such would not likely be the case were a Subchapter S corporation's taxable year to end, say, ten months into the taxpayer's next taxable year. If, instead of "holding open" the first year's return, we "hold over" the worthlessness deductions into the year in which net operating losses are recognizable, we will of course avoid the necessity for *reporting* such losses on the return for the first year. We will not, however, avoid the necessity for first *knowing* the existence and amount of such losses before the return for the first year can be filed, for the taxpayer would want to postpone his worthlessness deductions only if he first knew that his prospective deduction for net operating losses would in fact be greater. Each reporting option requires therefore that the taxpayer's return for the year in which worthlessness occurs be held open until the existence and amount of net operating losses are known, a time which may be many months into the following year and well beyond the usual deadline for filing a return.

More importantly, both options would lead in other cases to results which are themselves contrary to the Code and unintended by Congress. While it is not entirely clear what general rule lies behind Judge Hall's opinion, we think both obvious possibilities go too far. First, one might allow an owner of a Subchapter S corporation the taxable year of which differs from that of his own to deduct the full net operating loss of the corporate year which extends into the following taxable year of the taxpayer whenever worthlessness occurs during the taxpayer's first taxable year. That is, while the occurrence of worthlessness in one year would ordinarily prevent a deduction for net operating losses in future years, the taxpayer would get whatever losses were attributable to any corporate taxable year beginning in his own taxable year in which worthlessness occurs, even if the corporate year began after the event of worthlessness. In effect, the taxpayer would get his foot in the door with respect to net operating losses in the year following bankruptcy by virtue of the corporation's taxable year having differed from that of his own by even a single day. A second possibility is more limited: the taxpayer gets the benefit of the full year's net operating losses, but only when worthlessness occurs, as it did in this case, *during* the second of the two corporate taxable years which coincide in part with the relevant taxable year of the taxpayer. Under this more limited rule the taxpayer would not get the operating loss deduction if worthlessness occurred *prior* to the beginning of the corporation's taxable year the net operating losses of which were at stake.

Whichever general rule was intended by Judge Hall, we think this approach goes beyond the simple congressional intention to prefer net operating losses when they conflict with worthlessness deductions. We may assume that Congress intended to give preference to net operating losses over worthlessness deductions which accrue in the same taxable year of the taxpayer, even where some portion of the net operating loss is attributable to the portion of the taxpayer's year following the actual date of worthlessness. And we may further assume—as the parties argue—that Congress would at least have intended (had the matter been considered) a preference for the proportionate part of the corporation's net operating losses occurring before worthlessness in cases like the one at bar where worthlessness occurs in a taxable year of the taxpayer which coincides only in part with that of his Subchapter S corporation. It is quite another matter, however, to derive from the Code a blanket preference for net operating losses incurred during any corporate taxable year which in *any* degree coincides with a taxpayer's earlier taxable year in which worthlessness occurs. We cannot ignore the language of § 1374(c)(2), which plainly limits the taxpayer's net operating loss deduction to the amount of his basis in his corporate stock and debt. Nor can we assume that Congress did not understand that, by requiring basis to be adjusted downward in response to an event render-

ing the stock and debt worthless, future net operating losses could not be deducted. The legislative scheme unambiguously puts a limit on the taxpayer's deduction of Subchapter S net operating losses, and that limit certainly comes into play in any taxable year of the taxpayer following a year in which the taxpayer's stock and debt is rendered worthless. Judge Hall's solution may do no serious damage to the legislative scheme where, as here, the Subchapter S corporation's taxable year ends only one month after the taxpayer's. In other cases, however, the corporation's taxable year may end a month *before* the end of the taxpayer's year; in those cases the taxpayer would receive a deduction for a net operating loss for a corporation year which almost in its entirety follows the taxable year of the taxpayer in which worthlessness occurred, and which, if Judge Hall intended the broader rule explained above, might not even have begun until after the event of worthlessness.

We do not intend this discussion of the alternative solutions offered by the Tax Court and by Judge Hall to criticize those solutions as a matter of public policy, nor do we intend this discussion to be an evaluation in any comprehensive way of Congress' true intentions in this area. What our discussion should illustrate, instead, is the real difficulty involved in any judicial solution to the problem arising from the complicated interaction of Code §§ 165(g), 166(d) and 1374 in the context of a taxpayer with a taxable year differing from that of his Subchapter S corporation. Each possible rule affects not only the taxpayer now before us, but seems also to affect other taxpayers in ways not intended by Congress and not altogether foreseeable. This statutory problem therefore involves questions which are fundamentally different from those involved in previous cases modifying the literal terms of the Code under the *Holy Trinity* doctrine. While Congress does not seem to have intended the outcome unambiguously dictated by the Code in this case, neither does Congress seem to have intended either of the schemes proposed by the parties to this suit. The choices implicated by the problem raised in this case are difficult and interrelated; the solution, when and if one is designed, will not be a simple one. We think therefore that a court—hearing only one case in this area, and an unusual one at that—is not the proper place to revise §§ 165(g), 166(d) and 1374 so as to alleviate the problem now before us. That problem can properly be tackled only on general terms by a legislative body, and we therefore leave the modification of these Code provisions to Congress. Until and unless Congress acts to modify these sections, we will apply them as now written.

## III. THE INTEREST DEDUCTION

■ The Tax Court held that the taxpayer was not entitled under § 163(a) to deduct interest payments that he made on notes of Furniture as a result of his guaranty of such notes because "even though [the taxpayer] was liable in solido on the debt of Furniture and thus was primarily liable to the creditor, he was secondarily liable vis-a-vis Furniture." 69 T.C. at 707. The Tax Court further held that the real estate of Furniture secured by the collateral mortgage did not serve as collateral for his obligation and that, consequently, no interest deduction was available. The taxpayer, relying on this court's decision in *Nelson v. Commissioner*, 281 F.2d 1 (5th Cir. 1960), contends on appeal that "interest paid by one secondarily liable on the hand note" is deductible. Looking to *Nelson* for support does not avail the taxpayer. *Nelson* clearly holds that a taxpayer is not entitled to deduct under § 163(a) an interest payment made by him as a guarantor of the indebtedness of another person; the indebtedness must be that of the taxpayer. *Id.* at 5. *See also Guardian Investment Corp. v. Phinney*, 253 F.2d 326 (5th Cir. 1958) (interest is not deductible unless paid on an obligation of the taxpayer); *United States v. Norton*, 250 F.2d 902 (5th Cir. 1958) (a deduction may not be taken for an interest payment unless the interest is owed on an indebtedness of the one seeking the deduction); *Commissioner v. Henderson's Estate*, 147 F.2d 619 (5th Cir. 1945) (deduction may

not be taken unless interest was owed upon the indebtedness of the taxpayer). Applying these well-settled principles to this case, it is clear that the Tax Court properly denied the taxpayer the interest deduction here in issue; he made payments of "interest" on the indebtedness of Furniture, not on his own indebtedness.

The taxpayer, having failed to secure a deduction on the first prong of the test described in *Nelson*, urges that he has satisfied the second prong of that test and is entitled to a deduction for the interest he paid on the note of Furniture secured indirectly by property of Park and Vista. He argues that, as a shareholder or transferee of Park and Vista (each of which had endorsed the note and secured its liability by a note payable to "bearer," which was in turn secured by a collateral mortgage on its property), he was the legal or equitable owner of the property mortgage to secure that note. The Tax Court held that under those circumstances, even if the property were held to be legally or equitably owned by the taxpayer, it did not serve as collateral for the indebtedness, but instead as collateral for collateral. In our view, the position taken by the Tax Court with respect to the status of property covered by a collateral mortgage under the circumstances that exist in this case may well have elevated form over substance. If the terms of the hand note were not met, then the real estate would be foreclosed upon. Fortunately, however, we need not rule on this point. Treas.Reg. § 1.163–1(b), as in effect in 1966 and at present, provides in part that "[i]nterest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness." We agree with the Ninth Circuit's holding in *Golder v. Commissioner*, 604 F.2d 34, 36 (9th Cir. 1979), that this section of the regulations does nothing more than to permit the deduction of interest in situations where the taxpayer-borrower is not personally liable on a mortgage of property that is used as a security for a *loan to the taxpay-*

*er.* Here the money borrowed was used by Furniture and the loan was made to Furniture, not to the taxpayer. Accordingly, the holding of the Tax Court that the taxpayer was not entitled to deduct the interest is correct.

AFFIRMED.